UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENNIS F. BRENAY, SR. and
LINDA BRENAY,

        Plaintiffs,                        Case No. 15-cv-13213

v.                                          Honorable Thomas L. Ludington

MICHAEL SCHARTOW, et al,

        Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Dennis F. Brenay, Sr., and Linda Brenay brought suit against Defendants Michael Schartow, Kyle Glocksine, Troy Sierras, City of Essexville, and Bay City on September 10, 2015. Compl., ECF No. 1. Plaintiffs alleged two claims in the Complaint. The first, brought pursuant to 42 U.S.C. § 1983 against the individual officers, alleges that Defendants unlawfully entered Plaintiffs' home, used excessive force, and caused Brenay, Sr., to be arrested without probable cause. *Id.* at 14–15. The second, brought against the City of Essexville and Bay City pursuant to § 1983, alleges a policy and practice of inadequate training and supervision. *Id.* at 15–17. Plaintiffs contend that the officer Defendants violated their constitutional rights when attempting to arrest their son, Dennis Brenay, Jr., for a personal protective order violation. On September 6, 2016, the parties submitted a stipulated proposed order for the dismissal of Defendant Kyle Glocksine. ECF No. 29. At the close of discovery, the remaining Defendants filed motions for summary judgment. ECF Nos. 31, 32. On October 17, 2016, the parties submitted stipulated proposed orders for the dismissal of Defendants City of Essexville and Bay

City. ECF Nos. 35, 36. Defendants' motions for summary judgment as to the remaining Defendants will be granted for the reasons stated below.

## I.

Plaintiff Dennis F. Brenay, Sr., has been a resident of Essexville for over twenty years. Dennis, Sr., Dep. at 6, ECF No. 42, Ex. E. He and his wife, Linda Brenay, have been married since 1973. *Id.* The couple live with their son, Dennis F. Brenay, Jr.,[1] at a home in Essexville. *Id.* Defendant Michael Schartow is a sergeant with the Essexville Public Safety Department. Sierras Rep, ECF No. 40, Ex. 4. Defendant Kyle Glocksine is also an officer with the Essexville Public Safety Department. *Id.* Defendant Troy Sierras is an officer with the Bay City Police Department. *Id.*

### A.

On November 30, 2013, Defendant Sierras responded to a reported personal protective order violation. Jury Trial Tr. at 166, ECF No. 40, Ex. 1. After interviewing the alleged victim, Sierras learned that the subject of the protective order was Brenay, Jr. *Id.* The alleged victim reported that Brenay, Jr., had sent her several text messages and posted a photo of himself and the victim on Facebook. Sierras Rep. at 2. Sierras requested assistance from Sergeant Schartow and Officer Glocksine in contacting Brenay, Jr. *Id.*

The officers arrived at the Brenay residence and rang the bell. *Id.* Brenay, Sr., answered. *Id.* The Brenay residence's front entrance has two doors: an outer glass storm door and an inner steel door. Brenay, Sr., Dep. at 54–57. After being told that the officers were looking for Brenay, Jr., Brenay, Sr., closed the doors. Sierras Rep. at 2. According to the officers, Brenay, Sr.,

---

[1] Dennis Brenay, Jr., is not a Plaintiff in this case, despite his centrality to the narrative.

"slammed" the door. *Id.* Brenay, Sr., explains that he lost his balance as he was closing the door, causing the door to close loudly. Brenay, Sr., Dep. at 55.

**B.**

After Brenay, Jr., came downstairs, Brenay, Sr., opened the door again. *Id.* at 58. Brenay, Sr., stood in the doorway with his hand on the door frame, holding the glass storm door open. *Id.* at 58–59; Glocksine Rep at 2, ECF No. 40, Ex. 4. Brenay, Jr., was standing immediately behind his father. *See* Brenay, Sr., Dep. at 58; Glocksine Rep. at 2; Linda Brenay Dep. at 49–53, ECF No. 42, Ex. F. According to Brenay, Sr., his son was standing approximately six inches from the door frame and about a foot from the outside of the house. Brenay, Sr., Dep. at 59. According to Schartow, Brenay, Jr., was standing a "few feet" away from Officer Sierras. Prelim. Exam. at 10, ECF No. 40, Ex. 2. Linda Brenay was standing behind Brenay, Sr., close behind Brenay, Jr. Linda Brenay Dep. at 50–51. *See also* Photos from Brenay, Jr., Dep., ECF No. 32, Exs. G, H (photos of the entryway that Brenay, Jr., marked with his location and which indicate that he stood close beside or just immediately behind Brenay, Sr.).

Officer Sierras questioned Brenay, Jr., for several minutes about the alleged personal protective order violation. Brenay, Sr., Dep. at 158–61. The officers asked Brenay, Jr., to come outside onto the porch several times, but Brenay, Jr., and his parents declined. Sierras Rep. at 2. Brenay, Sr., and Linda Brenay attempted to interject periodically. *Id.* At one point, Brenay, Sr., asked if he could pose a question to the officers. *Id.* at 161. According to Brenay, Sr., Sierras refused to allow Brenay, Sr., to ask a question. *Id.* In response, Brenay, Sr., raised his hands in the air. *Id.* Because Brenay, Sr., had taken his hand off of the storm door, it began to close. *Id.* at 161–62. In his deposition, Brenay, Sr., indicated that he did not intend to shut the door in the officers' faces. However, the officers interpreted the closing glass door as an intentional attempt

to end the conversation. Glocksine Rep. at 2; Sierras Rep. at 2. Brenay, Sr., testified that he immediately began to push the door open again. Brenay, Sr., Dep. at 163–164. The police reports contradict that representation. Glocksine Rep. at 2; Sierras Rep. at 2.

Schartow then grabbed the storm door and began pulling it back open. Brenay, Sr., Dep. at 164–65; Glocksine Rep. at 2; Sierras Rep. at 2. At the same time, Sierras grabbed Brenay, Jr., by the wrist and pulled. Sierras Rep. at 2. According to the officers, Sierras also informed Brenay, Jr., that he was under arrest at this point. Glocksine Rep. at 2; Sierras Rep. at 2. Brenay, Sr., testified in his deposition that he never heard the officers indicate that Brenay, Jr., was under arrest. Brenay, Sr., Dep. at 164. Likewise, Linda Brenay testified that she never heard the officer say he was going to arrest Brenay, Jr. Linda Brenay Dep. at 60–61. However, Brenay, Jr., admitted in his deposition that the officer told Brenay, Jr., that he would be going with the officers and that Brenay, Jr., understood that he was being arrested. Brenay, Jr., Dep. at 75–76.

### C.

At this point, the parties' stories diverge. According to Brenay, Jr., Sierras then pushed him "back into the house" and tried to taser him. Brenay, Jr., Dep. at 77. According to Linda Brenay, Sierras was trying to pull Brenay, Jr., out of the house, while Brenay, Jr., was resisting and pulling back towards the house. Linda Brenay Dep. at 159–160. Brenay, Sr., testified that Sierras slammed Brenay, Sr., into the steel door as Sierras was attempting to grab his son. Brenay, Sr., Dep. at 69–71. Brenay, Sr., denied pushing any of the officers or attempting to interfere. Trial Tr. III at 44, ECF No. 40, Ex. 3.

According to Sierras:

> I told Brenay Jr. that he was under arrest for violating the PPO. I grabbed his wrist and attempted to pull him to me. Brenay Sr. still attempted to shut the door. I pushed the door back with my left hand and held onto Brenay Jr. with my right. I yelled, "He's under arrest!" One of the Essexville officers pushed on the door and

> I was able to grasp Brenay Jr. with both hands. I ordered Brenay Jr. to come outside. His parents pulled him further into the hallway. I was pulled into the doorway.

Sierras Rep. at 2.

> According to Glocksine:
>
> Ofc. Sierras was able to stop the door from being shut and advised Dennis Jr., Dennis Sr., and Mrs. Brenay that Dennis Jr. was under arrest for the PPO violation and would be going with him this evening. Dennis Sr. again tried to pull the door closed on these officer's and Ofc. Sierras was able to reach into the residence and grab ahold of Dennis Jr.'s arm. At this point Sgt. Schartow grabbed the door that Dennis Sr. was still trying to close and was able to pull it out of his hands so that officer's could get to Dennis Jr. Ofc. Sierras was telling Dennis Jr. that he was under arrest and told him to come outside. During this time Dennis Jr. was trying to pull away from Ofc. Sierras and Dennis Sr. was trying to get in between his son and the officer's. Dennis Sr. was trying to push his son back into the house at one point and then tried to push Ofc. Sierras away from his son moments later.

Glocksine Rep. at 2.

Regardless of whether Sierras forced himself and Brenay, Jr., into the house or Brenay, Jr., pulled the two men into the house, Sierras entered the hallway with Brenay, Jr. At this point, Schartow discharged a taser at Brenay, Jr., with no effect. Glocksine Rep. at 2. Schartow then "drive stunned" Brenay, Jr., in the arm. *Id.* As Brenay, Jr., and the officers entered the hallway, both Brenay, Sr., and Linda Brenay were physically contacted. Brenay, Sr., lost his balance and grabbed "somebody's arm." Brenay, Sr., Dep. at 70. When Schartow entered the house, Brenay, Sr., was struck in the stomach. *Id.* at 75. While the officers were trying to subdue Brenay, Jr., Linda Brenay was struck several times. Linda Brenay Dep. at 65–68. Sierras also kicked at the Brenay's dog when it approached him. *Id.* at 179–81.

According to Linda Brenay, her son resisted the entire time that the officers were attempting to handcuff him. *Id.* at 176. However, according to Brenay, Jr., he did not resist the officers once they had forced him to the ground. Brenay, Jr., Dep. at 43–46.

- 5 -

Brenay, Jr., was then taken into custody for violation of the personal protective order. He pled guilty to the charge. *See* District Court Registry, ECF No. 42, Ex. J. Brenay, Sr. and Brenay, Jr., were charged with hindering and obstructing the attempted arrest. At the preliminary examination, the state district judge found that there was probable cause to believe that the charged offense had been committed and bound the matter over to the circuit court. Prelim. Exam. Tr. at 56, ECF No. 31, Ex. 9. At the end of the criminal trial, the jury found Brenay, Sr., not guilty of resisting and obstructing a police officer, but found Brenay, Jr., guilty of the same charge. *People v. Brenay,* No. 323284, 2015 WL 8984161 (Mich. Ct. App. Dec. 15, 2015). The Defendants then moved for a directed verdict, and the circuit court granted the motion, reasoning that the officers unlawfully entered the house without a warrant. *Id.* at *1. On appeal, the Michigan Court of Appeals affirmed. *Id.* The court's decision reasoned as follows:

> Although there was probable cause for the arrest, the officers lacked authority to enter Brenay Sr.'s home. The officers did not have a search warrant, and Brenay Sr. never gave the officers consent to enter his home. Indeed, Brenay Sr. was attempting to close the door on the officers when defendant was seized. Thus, when Sierras reached across the threshold and past Brenay Sr. to grab defendant, he entered the home without authorization. Defendant never placed himself in a public place; rather, he was inside the home and behind his father for the duration of the conversation. . . . Therefore, Sierras's conduct violated constitutional protections and was thus unlawful.

*Id.* at *3.

## II.

Now before the Court is Defendants' motions for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

As already mentioned, Defendants Kyle Glocksine, City of Essexville, and Bay City have been dismissed with prejudice by stipulation of the parties. Accordingly, the only remaining Defendants are Sergeant Schartow and Officer Sierras. Defendants move that all remaining claims against those Defendants be dismissed based on qualified immunity. Plaintiffs bring three separate claims against the individual officers. First, they argue that Defendants' entry into the home was an invasion of their Fourth and Fourteenth Amendment rights. Compl. at 14. Second, they argue that the officers used "gratuitous, unnecessary, and excessive force" when they unlawfully entered the home. *Id.* Third, they argue that there was no probable cause to support the arrest and prosecution of Brenay, Sr.. *Id.* at 15. Defendants argue that all three claims are barred by qualified immunity.

"A plaintiff proceeding under § 1983 must establish that a person acting under color of state law deprived him of a right secured by the Constitution or by federal law." In the specific context of § 1983 actions, the non-moving party "must demonstrate a genuine issue of material fact as to the following two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) that the deprivation was caused by a person acting under color

of state law. *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quotations and citations omitted).

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity turns on the question of whether a defendant's action violated clearly established law. *Id*. at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id*. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### A.

Defendants first argue that their entry into the Brenay home was not unlawful under clearly established law. Specifically, Defendants argue that officers can enter a home without a warrant to arrest an individual if the encounter begins in public view and the suspect attempts to flee into the house. In support, Defendants cite several cases.

In *United States v. Santana*, the suspect was "standing in the doorway of the house." 427 U.S. 38, 39 (1976). As the officers approached, Santana "retreated into the vestibule of her house." *Id.* The officers followed through the open door and arrested Santana. *Id.* The Court explained that "'[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.'" *Id.* at 42 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). The Court further concluded that Santana was "not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* Thus, the Court held that the warrantless arrest was not unconstitutional, even though Santana retreated into her home, because the arrest had begun in a public place. *Id.* at 43.

In *Moosdorf v. Krot*, the officers pursued the suspect to his home. No. 05-73033, 2006 WL 2644994, at *2 (E.D. Mich. Sept. 14, 2006). Despite the officers' commands to stay outside, he entered his house. *Id.* The officers approached the door. *Id.* The "Plaintiff was standing

between the threshold and the stormdoor, which he was holding ajar." *Id.* When the suspect refused to come outside, the officers grabbed him and pulled him outside. *Id.* at *3. The *Moosdorf* Court noted that "Plaintiff did not remain behind his storm door during his interaction with the Officers. Instead, he repeatedly came outside, engaged in argument with the Officers, and then retreated indoors." *Id.* at *6. The Court concluded that the officers were in hot pursuit of the suspect and that the suspect could not avoid arrest simply by ducking into his home. *Id.* at *6–7. The Court thus found that the seizure was lawful. The Court further found that, even if the seizure was not lawful, the officers' conduct did not violate a clearly established constitutional right.

Plaintiffs argue that the officers' conduct in entering the Brenay home was illegal under clearly settled law. In support, Plaintiffs cite *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984). In *Morgan*, the officers surrounded the house, flooded the area with spotlights, and demanded via bullhorn that the suspect exit the house. *Id.* at 1161. In response, the suspect appeared at the front door with a gun, set the gun down, and then voluntarily went outside. *Id.* After the suspect was arrested, an officer entered the home to retrieve the gun the suspect had put down. *Id.* The Sixth Circuit affirmed the suppression of that gun as evidence, holding that the "record here reveals no exigency sufficient to justify the warrantless entry of the home and arrest of Morgan." *Id.* at 1162. The *Morgan* Court rejected the idea that the officers were in hot pursuit of the suspect or that "immediate police action was needed to prevent the destruction of vital evidence or thwart the escape of known criminals." *Id.* at 1163. The Court noted that "Morgan was peacefully residing in his mother's home until he was aroused by the police activities occurring outside." *Id.* at 1166. Thus, the Court reasoned, Morgan had not voluntarily exposed himself to a warrantless arrest by appearing at the door. *Id.* Both Plaintiffs and the *Morgan* Court

cite *Payton v. N.Y.* in support. 445 U.S. 573, 581 (1980). In *Payton*, the police broke into the suspect's apartment with a crowbar, and the Court held that the warrantless search and arrest was unconstitutional.

Plaintiffs also cite several cases for the proposition that a person cannot be charged with obstruction or interference simply for refusing to exit his or her home. *See Bourgeois v. Strawn*, 501 F. Supp. 2d 978, 987–88 (E.D. Mich. 2007) ("The plaintiff's refusal to exit his home on the defendant's order itself amounted to no crime supporting probable cause to arrest."). *See also Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (holding that "a simple refusal to exit one's own home" did not justify the officer's decision to enter the home and taser the suspect twice in the living room); *People v. Nyilas*, No. 311721, 2013 WL 4081213, at *4 (Mich. Ct. App. Aug. 13, 2013) (holding that the suspect had no obligation to open the door or answer police questions). Plaintiffs argue that, under Michigan law, an individual has the right to resist illegal police conduct, including entry into constitutionally protected areas. *See People v. Moreno*, 491 Mich. 38, 58 (2012) (holding that the Michigan legislature had not "abrogated the common-law right to resist unlawful invasions of private rights").

Plaintiffs further submit that the most analogous district court case would be this Court's decision in *Tobias v. Pletzke*, 933 F. Supp. 2d 892 (E.D. Mich. 2013). In *Tobias*, this Court rejected the argument that an officer's entry into a home was permissible pursuant to the consent and exigency exceptions to the warrant requirement. The Court noted that the Plaintiff, who was standing outside the house on the porch, explicitly objected to the officer's entry. *Id.* at 909. The Court further found that the only potential exigent circumstance was a risk of danger to others (not hot pursuit of a felon or the need to prevent the suspect's escape), and that there was no indication any person was in danger inside the house. *Id.* at 910–11.

None of Plaintiffs arguments or cases demonstrate that the Defendants' behavior in this case was unlawful under clearly established law. None of the cases which Plaintiffs cite address a situation where the suspect voluntarily revealed himself to the police at the entrance to the home, engaged in conversation, and then retreated into the home. *Morgan* involved a clearly coercive situation where the suspect's house was surrounded and the suspect's decision to leave the home was not voluntary in a constitutional sense. *Payton* involved officers physically breaking into the suspect's residence, facts which are clearly distinguishable from this case. The cases Plaintiffs cite for the proposition that a person can resist officers who illegally enter his or her home do not clarify the underlying uncertainty regarding whether the entry in this case was unlawful or not. In *Nyilas*, the suspect never opened the door or answered questions. In contrast, Brenay, Jr., voluntarily came to the door and answered questions. And in *Tobias*, the Plaintiff was outside the house and there was no altercation occurring inside the house. Thus, *Tobias* is clearly distinguishable from the current case, where the Defendants are arguing that Brenay, Jr., presented himself to the officers in public view, then attempted to retreat into his home, and the officers followed in hot pursuit.

Plaintiffs are correct that the Supreme Court has drawn a firm line at the entrance of the house, *see Payton*, 445 U.S. at 590, but *Santana* demonstrates that a person standing in the doorway of the home cannot necessarily reclaim Fourth Amendment protection by simply retreating into his or her home. In *Santana*, the Court emphasized that the suspect was "exposed to public view, speech, hearing, and touch." 427 U.S. at 42. While the Michigan Circuit Court and Court of Appeals concluded that Brenay, Jr., "never placed himself in a public place," the testimony of all parties clearly establishes that Brenay, Jr., was standing close enough for the officers to publically view him, hear him, and touch him. *See People v. Brenay,* No. 323284,

2015 WL 8984161 at *3 (Mich. Ct. App. Dec. 15, 2015); Brenay, Sr., Dep. at 159–164; Linda Brenay Dep. at 149–150; Brenay, Jr., Dep. at 74–75. That is, Brenay, Jr., was standing close enough for an officer to reach inside the doorway and grab his wrist without actually entering the house. Moreover, Brenay, Jr., has testified that he understood that he was being arrested before the door began to shut and Sierras grabbed his wrist. Brenay, Jr., Dep. at 75–77. Under these circumstances, a reasonable officer could have believed that Brenay, Jr., had exposed himself to public view, hearing, and touch, as explained by the *Santana* Court. Further, the closing door and the resistance by Brenay, Jr., after Sierras grabbed his wrist could be interpreted by a reasonable officer as an attempt by the suspect to escape further into the house after an arrest had been set in motion.

Importantly, when examining the question of the Defendants' entitlement to qualified immunity, the question for the Court is not whether the officers' conduct was actually unconstitutional. Rather, Defendants are entitled to qualified immunity if it is not "beyond debate" that their actions violated clearly established law. *Ashcroft v. al-Kidd*, 563 U.S. at 741. Given Brenay, Jr.'s, proximity to the door, the question of whether he placed himself in public view is not beyond debate. Because not "every reasonable official'" would have understood that the arrest was unlawful at the time it occurred, the arrest did not violate a clearly established right. *Reichle*, 132 S. Ct. at 2093. Accordingly, Defendants are entitled to qualified immunity on Plaintiffs' unlawful entry claim.

To the extent Plaintiffs separately challenge Schartow's entry into the home a few moments after Sierras entered, he is also entitled to qualified immunity. At that point, Sierras and Brenay, Jr., were struggling in the hallway. The police have a right to enter a home to "keep a

person within safe from harm." *Tobias*, 933 F. Supp. 2d at 910. Schartow's entry into the home to assist Sierras in subduing Brenay, Jr., was not in contravention of a clearly established right.

**B.**

Defendants next argue that they are entitled to qualified immunity regarding Plaintiffs' excessive force claim because the contact with Brenay, Sr., and Linda Brenay was merely incidental. Typically, a claim that law enforcement used excessive force in arresting a plaintiff is "assessed under the Fourth Amendment 'objective reasonableness' standards." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). In this case, however, Brenay, Jr., is not bringing the excessive force claim. Rather, his parents are alleging that the officers used excessive force against them while the officers were arresting Brenay, Jr. In that situation, the standard is different:

> [T]he Fourth Amendment "reasonableness" standard does not apply to section 1983 claims which seek remuneration for physical injuries inadvertently inflicted upon an innocent third party by police officers' use of force while attempting to seize a perpetrator, because the authorities could not "seize" any person other than one who was a deliberate object of their exertion of force. . . . Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official "seizure" are adjudged according to substantive due process norms.

*Id.*

Thus, the Plaintiffs must show that Defendants' conduct shocked the conscience. *See Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001).

More importantly, a § 1983 claim alleging excessive force against an innocent third party requires a showing that the officers acted with a purpose to cause harm, at least where the situation is "a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation". *Claybrook*, 199 F.3d at 360. *See also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998); *Draw v. City of Lincoln Park*, 491 F.3d 550, 555

(6th Cir. 2007). The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989). Similarly, "'[n]ot every push or shove'" violates the Fourth Amendment, even if it appears unnecessary after the fact. *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Plaintiffs do not even attempt to argue that Defendants' actions shocked the conscience. Rather, Plaintiffs argue that officers should be liable for the natural consequences of their actions: "the officers had no business whatsoever being in the Brenay household . . . . Because they unlawfully entered the Brenay home, they are responsible for whatever damage they caused." Pl. Resp. Br. at 21. In support, Plaintiffs cite several cases which discuss principles of causation under § 1983, but no cases dealing with excessive force claims.

Thus, Plaintiffs have not attempted to establish that Defendants' actions shocked the conscience. Even construing the facts in a light most favorable to Plaintiffs, Brenay, Sr., and Linda Brenay were struck several times while the officers were in the process of arresting Brenay, Jr. There is no evidence that the officers intended to harm Brenay, Sr., and Linda Brenay. All physical contact was incidental, which falls short of conscience-shocking force. Further, and as already discussed, Defendants are protected from liability for entry into the home by qualified immunity. Because Defendants' entry into the home was not clearly unlawful, any incidental contact with Plaintiffs that may have occurred in the course of an otherwise lawful arrest does not constitute excessive force. Thus, Defendants are also entitled to qualified immunity on the excessive force claim.

**C.**

Finally, Defendants argue that they are entitled to qualified immunity on the malicious prosecution claim.[2] A claim of malicious prosecution is distinct from a claim of false arrest in that the malicious prosecution claim "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Wallace v. Kato*, 549 U.S. 384, 390 (2007). A plaintiff raising a malicious prosecution claim must satisfy the following four elements: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) probable cause for the prosecution was lacking; (3) the plaintiff suffered a deprivation of liberty under the Fourth Amendment as a consequence of the legal proceeding; and (4) the criminal proceeding resolved in the plaintiff's favor. *See Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010). Under the first prong, a defendant need not have actually made the decision to prosecute to be held liable for malicious prosecution. Instead, the Sixth Circuit has determined that law enforcement officers may be held liable for malicious prosecution if they influence or play a role in the criminal process. *Id*. at 311-12. "The Fourth Amendment conditions warrants on probable cause and prohibits unreasonable seizures. A police officer violates those restrictions only when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 771–72 (6th Cir. 2014).

Defendants argue that probable cause existed in this case, pointing to the district court's determination that sufficient probable cause existed to bind over the case to the circuit court. In response, Plaintiffs argue that the officers "cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006).

---

[2] Although Plaintiffs' complaint does not clearly indicate whether their third claim is for malicious prosecution or wrongful arrest, Plaintiffs represent that they are bringing a malicious prosecution claim. *See* Pl. Resp. Br. at 17. That representation will be relied upon by the Court.

The *Gregory* Court explained that the Plaintiff would have to present evidence "that the officers (1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Id.* Even if Plaintiffs can show that the officers made misrepresentations, the malicious prosecution claim still fails if the Court finds that there was probable cause, notwithstanding the false statements. *See Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001).

No genuine issue of material facts exists here. Plaintiffs argue that Defendants made several false statements in their reports. Specifically, Plaintiffs argue that the Glocksine's report incorrectly states that Brenay, Sr., was attempting to pull Brenay, Jr., back into the house and push Sierras away. Plaintiffs also argue that Sierras's report improperly asserts that Brenay, Sr., pulled Brenay, Jr., further into the hallway. However, even construing the facts in a light most favorable to Plaintiffs, those statements in the reports do not constitute a reckless disregard for the truth. Brenay, Sr., admits that the storm door started closing because of an action he took right before the officers entered the home. Brenay, Sr., Dep at 69–79. His testimony also establishes that he interjected himself into the conversation twice. *Id.* at 61, 66. He acknowledges that he lost his balance and touched either Brenay, Jr., or Sierras after they entered the home. *Id.* at 69–79. He also admits to holding onto the door knob. *Id.* There is no dispute that there was repeated physical contact between Brenay, Sr., and the officers. *Id.*

Even under the sequence of events described by Brenay, Sr., a reasonable officer could have construed his actions as attempting to obstruct the arrest. Immediately after the officers told Brenay, Jr., that he was going to be arrested, the storm door started to close. When the officers tried to reopen the door, they wrenched it out of Brenay, Sr.'s, grip. Once Brenay, Jr., and Sierras were inside, Brenay, Sr., touched one or both of them. Even if that was because Brenay, Sr., lost

his balance, a reasonable officer would have interpreted that act as an attempt to separate Sierras and Brenay, Jr. In short, there is no indication that the details included in the officers' reports were intentional misrepresentations. Rather, the reports appear to contain a reasonable interpretation of the events, even if only Brenay, Sr.'s, testimony is relied upon. Accordingly, there is no evidence that the district court relied upon intentional misrepresentations in finding that probable cause existed. More importantly, the sequence of events as described by Plaintiffs provides a sufficient basis for a reasonable officer to conclude that probable cause existed. Accordingly, Defendants are entitled to qualified immunity on Plaintiffs' malicious prosecution claim.

**IV.**

Accordingly, it is **ORDERED** that Defendants' Motions for Summary Judgment, ECF Nos. 31, 32, are **GRANTED.**

It is further **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED with prejudice.**

Dated: November 30, 2016    s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 30, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager